Approved: _____
KEDAR S. BHATIA / DEREK WIKSTROM
Assistant United States Attorneys

Before:  THE HONORABLE VALERIE FIGUEREDO
United States Magistrate Judge
Southern District of New York

**23 MAG 1373**

------------------------------------ X
                                     :
UNITED STATES OF AMERICA             :   **SEALED COMPLAINT**
                                     :
     - v. -                          :   Violation of 18 U.S.C. § 371
                                     :
SEAN LINDSAY-JORDAN,                 :   COUNTY OF OFFENSE:
                                     :   BRONX
          Defendant.                 :
                                     :
------------------------------------ X

SOUTHERN DISTRICT OF NEW YORK, ss.:

JUSTIN STONE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Bribery)

1. From at least in or about July 2021, up to and including at least in or about August 2021, in the Southern District of New York and elsewhere, SEAN LINDSAY-JORDAN, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit bribery, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and (a)(2).

2. It was a part and an object of the conspiracy that SEAN LINDSAY-JORDAN, the defendant, being an agent of an organization, government, and agency that received, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, to wit, the New York City Department of Correction ("DOC"), corruptly would and did solicit and demand for the benefit of a person, and accept and agree to accept, something of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such organization, government, and agency involving something of value of $5,000 and more, in violation of Title 18, United States Code, Section 666(a)(1)(B).

## Overt Acts

3. In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. On or about July 14, 2021, SEAN LINDSAY-JORDAN, the defendant, while employed by the DOC, brought contraband including cellphones, controlled substances, and cigarettes into a DOC facility and provided the contraband to an inmate.

    b. On or about August 6, 2021, LINDSAY-JORDAN, while employed by the DOC, brought contraband into a DOC facility and provided it to an inmate.

    c. On or about August 23, 2021, LINDSAY-JORDAN, while employed by the DOC, brought contraband into a DOC facility and provided it to an inmate.

    d. In advance of each of these contraband deliveries, and in exchange for introducing the contraband into the DOC facility, SEAN LINDSEY-JORDAN, the defendant, met with a co-conspirator in the Bronx and received cash bribes collectively totaling $5,000 and more.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been personally involved in the investigation of this matter, which has been jointly investigated with the New York City Department of Investigation ("DOI"). This affidavit is based upon my personal participation in the investigation of this matter, my conversations with other law enforcement officers, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my participation in the investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

5. At all times relevant to this Complaint, SEAN LINDSAY-JORDAN, the defendant, was a Correction Officer employed by the DOC. LINDSAY-JORDAN was assigned to work at the Anna M. Kross Center ("AMKC"), which is one of the jail facilities on the New York City jail complex on Rikers Island in the Bronx, New York. AMKC, like the other facilities on Rikers Island, is operated by the DOC.

6. As explained in greater detail below, in or about July and August 2021, SEAN LINDSAY-JORDAN, the defendant, engaged in a scheme to smuggle contraband into AMKC in exchange for bribes and kickbacks. Specifically, LINDSAY-JORDAN would meet with an intermediary ("CC-1"), a female former Correction Officer who was in a relationship with an inmate ("Inmate-1") housed at AMKC. CC-1 was previously employed by the DOC, and worked on Rikers Island, but resigned from the DOC in or about mid-2021 while she was under

investigation for engaging in an inappropriate relationship with Inmate-1. To carry out the scheme, CC-1 would meet with LINDSAY-JORDAN in the Bronx, New York. At these meetings, CC-1 would provide contraband and cash bribes to LINDSAY-JORDAN. In exchange for the cash bribes, LINDSAY-JORDAN would then carry the contraband into AMKC and deliver it to Inmate-1 or other inmates associated with Inmate-1.

### Background About DOC

7.   Based on my communications with other law enforcement officers, my review of DOC records, and my training and experience, I have learned, among other things, the following:

   a.   According to the DOC Employee Rules and Regulations, employees of DOC facilities "shall not enter into any transaction with an inmate, nor carry, convey, or make accessible to an inmate within a facility/command any intoxicant, opiate, narcotic, or other contraband article, nor traffic with an inmate in any manner." According to the DOC Inmate Handbook, "'Contraband' shall mean any item that is not sold in the commissary, that is not on the approved list of permissible items, that is possessed in more than the approved amount or, that the inmate does not have permission to possess," including, "items that may disrupt the safety, security, good order and discipline of the facility." The DOC Inmate Handbook also expressly prohibits inmates from possessing drugs and cellphones, stating that inmates "shall not sell or exchange prescription drugs or non-prescription drugs" and that they shall not possess any type of electronic telecommunication and/or recording device or any part of such instrument, which is designed to transmit and/or receive telephonic, electronic, digital, cellular or radio communications." Finally, the DOC Inmate Handbook warns that "[a]ny person who tries to introduce contraband into a facility may also be subject to criminal prosecution." Based on the foregoing, as well as my training and experience and my communications with other law enforcement officers, I know that a cellphone of any type is considered contraband, as are marijuana, synthetic marijuana, tobacco, and scalpels of any kind.

   b.   The primary duty of Correction Officers is to ensure the care, custody, and control of the inmate population of the DOC. In connection with this duty, Correction Officers participate in inspections and searches of inmates and DOC facilities, and are tasked with, among other things, ensuring that contraband is not brought into the facilities at which they work. DOC employees, including SEAN LINDSAY-JORDAN, the defendant, receive training on employee rules and regulations, which prohibit employees from, among other things, entering into transactions with inmates and providing inmates with contraband.

8.   Based on my review of the New York City Counsel's Report of the Finance Division on the Fiscal 2022 Preliminary Plan for the Department of Correction,[1] I know that the budget for the DOC for fiscal year 2021 included $8,286,000 in federal funding received by the DOC.

---

[1] Available at https://council.nyc.gov/budget/wp-content/uploads/sites/54/2021/05/072-DOC.pdf.

### Securus Calls

9. Based on my participation in this investigation, my review of law enforcement and DOC records, my conversations with other law enforcement officers, and my review of recorded calls and summaries of such calls obtained and prepared during this investigation, I have learned, among other things, the following:

    a. Phone calls placed by inmates housed at facilities on Rikers Island, including AMKC, are recorded by a system called Securus.

    b. To use the Securus system, each inmate is assigned a personal identification number ("PIN") that must be used to access the system. However, although inmates are required by DOC rules to use their own PIN to make outgoing calls, in practice inmates frequently use other inmates' PINs to disguise their participation in outgoing calls.

    c. Sometimes, Inmate-1 would place Securus calls using other inmates' PINs, but I and other law enforcement officers are able to determine when Inmate-1 is placing a call based on Inmate-1's voice and the phone numbers Inmate-1 calls.

    d. Beginning in or about October 2020, while CC-1 was still employed by the DOC as a Correction Officer, Inmate-1 began calling various cellphones used by CC-1 (based on my and other officers' recognition of CC-1's voice) on recorded calls via Securus. Over time, Inmate-1 would sometimes stop using recorded lines to call CC-1 for some period of time, but would resume doing so after searches at the jail resulted in seizures of cellphones.

### Evidence of LINDSAY-JORDAN's Delivery of Contraband to Inmate-1 in July 2021

10. Based on my discussions with other law enforcement officers, and my review of summaries of recorded Securus calls prepared by other law enforcement officers, I have learned, among other things, that on or about July 8, 2021, Inmate-1 placed a Securus call to CC-1 at a certain cellphone number ending in 1077 (the "CC-1 1077 Phone"). During the call, Inmate-1 and CC-1 discussed, among other things, obtaining a "pedro." Based on my training and experience and my involvement in this investigation, I believe that "pedro" is slang used by Inmate-1 and CC-1 that refers to a contraband cellphone. This belief is bolstered by Inmate-1 and CC-1's discussions, in which, for instance, they refer to a "pedro" with a "SIM." Based on my training and experience, I know that a SIM card is a chip that can be inserted into a cellphone to enable the cellphone to access a cellphone provider's network, so that the cellphone can be used to place calls and access the internet. On or about July 11, 2021, Inmate-1 placed a Securus call to the CC-1 1077 Phone. During that call, CC-1 stated "who is this...Papa sent me." (Based on my discussions with other law enforcement officers who have reviewed numerous recorded communications between CC-1 and Inmate-1, I know that CC-1 refers to Inmate-1 as "Papa.") Inmate-1 then asks CC-1 if someone "hit [CC-1] on WhatsApp," and CC-1 answers in the affirmative. Inmate-1 then stated that it was "lit," and that it was the "situation," which, based on my training and experience, I believe was Inmate-1's confirmation that the message was from the person CC-1 should be meeting with.

11. Based on my review of New York Department of Motor Vehicle records, I know that CC-1 is the registrant of a white Honda Civic bearing a certain New York registration (the "CC-1 Honda").

12. Based on my review of mobile license plate reader data, I know that on or about July 13, 2021, the CC-1 Honda traveled to the Bronx. As described in greater detail below, SEAN LINDSAY-JORDAN, the defendant, was interviewed by law enforcement and identified the location in the Bronx where he would meet with CC-1 to exchange contraband and bribe payments, and the mobile license plate reader data for the CC-1 Honda on or about July 13, 2021, is consistent with travel to that location.

13. Based on my discussions with other law enforcement officers, and my review of summaries of recorded Securus calls prepared by other law enforcement officers, I have learned, among other things, that on or about July 13, 2021, CC-1 and Inmate-1 discussed paying SEAN LINDSAY-JORDAN, the defendant, $5,000, and discussed CC-1 obtaining half of that amount herself by withdrawing money from banks. On or about July 14, 2021, CC-1 confirmed to Inmate-1 that CC-1 had paid $5,000 to LINDSAY-JORDAN.[2]

14. Based on my review of records provided by multiple financial institutions, I know that on or about July 13, 2021, CC-1 made ATM withdrawals at two different financial institutions totaling $2,500.

15. Based on my review of surveillance footage from AMKC from on or about July 14, 2021, I know that on that date, surveillance footage captured SEAN LINDSAY-JORDAN, the defendant, walking into and then out of a janitor closet at Inmate-1's housing area at AMKC. Shortly thereafter, surveillance footage captured Inmate-1 going into the janitor closet and carrying a large blue bucket out of the closet. The surveillance footage also captured interactions between LINDSAY-JORDAN and Inmate-1.

16. Based on my discussions with other law enforcement officers, and my review of summaries of recorded Securus calls prepared by other law enforcement officers, I have learned, among other things, that on or about July 14, 2021, Inmate-1 placed a Securus call to the CC-1 1077 Phone, and asked CC-1, in substance and in part, for a passcode, and inquired about a particular four-digit number. Based on my training and experience and my involvement in this investigation, I believe that this was a request for a password or PIN that could be used to access a contraband cellphone Inmate-1 had recently received.

---

[2] In these calls, CC-1 and Inmate-1 do not refer to LINDSAY-JORDAN by name; when discussing the amount paid to an unnamed person, they discuss a total amount of "5," and CC-1 discusses the need to withdraw "25." Based on my training and experience, my involvement in this investigation, and my discussions with other law enforcement officers, I believe that in these discussions, CC-1 and Inmate-1 were discussing payments to LINDSAY-JORDAN, and were discussing amounts of $5,000 total and $2,500 to be withdrawn by CC-1.

17. Based on my review of toll records for the CC-1 1077 Phone, I know that beginning on or about July 13, 2021, the CC-1 1077 Phone began exchanging calls with a certain cellphone with a call number ending in 3773 (the "3773 Phone").

18. Based on my review of subscriber records for the CC-1 1077 Phone, I know that it is subscribed to in CC-1's name, with an email address containing CC-1's first initial and last name (the "CC-1 Email"). Based on my review of subscriber records for the 3773 Phone, I know that it is a prepaid phone subscribed to in the name "PREPAID CUSTOMER," but that the CC-1 Email is the subscriber email for the 3773 Phone.

19. On or about August 11, 2021, during a search of AMKC, an Apple iPhone associated with call number 3773—*i.e.*, the 3773 Phone—was recovered. Based on my review of the contents of the 3773 Phone, I know that it contained, among other things, the following:

   a. Multiple photographs of Inmate-1 and CC-1, including photographs that appear to be screenshots taken on the phone while it was using Apple's FaceTime feature, with images of Inmate-1 and CC-1 picture-in-picture.

   b. Text message communications with the CC-1 1077 Phone, which was saved to the contacts in the 3773 Phone as "Wifey."

   c. Multiple photographs of Inmate-1 and other inmates—with clothing and surroundings consistent with their being at AMKC—holding various contraband, including packages of what appears to be marijuana as well as cigarettes.

### LINDSAY-JORDAN's Additional Contraband Deliveries in August 2021

20. Based on my review of toll records for the CC-1 1077 Phone, I know that on or about August 5, 2021, the CC-1 1077 Phone exchanged a series of phone calls with a cellphone with a call number ending in 7331 (the "7331 Phone"). Based on my review of subscriber information for the 7331 Phone, I know that the 7331 Phone is subscribed to in the name of SEAN LINDSAY-JORDAN, the defendant.

21. Based on my review of surveillance footage from AMKC from on or about August 6, 2021, I know that on that date, surveillance footage captured SEAN LINDSAY-JORDAN, the defendant, walking into and then out of a janitor closet at Inmate-1's housing area at AMKC. Shortly thereafter, surveillance footage captured Inmate-1 going into the janitor closet and carrying a large blue bucket out of the closet. The surveillance footage also captured interactions between LINDSAY-JORDAN and Inmate-1.

22. Based on my discussions with other law enforcement officers and my review of related reports, I know that on or about August 11, 2021, Correction Officers conducted a search of the housing area where Inmate-1 is housed at AMKC and recovered a substantial amount of contraband, including the 3773 Phone discussed above and multiple other cellphones, cigarettes, marijuana, and sheets of paper soaked in controlled substances.

23. Based on my discussions with other law enforcement officers, and my review of summaries of recorded Securus calls prepared by other law enforcement officers, I have learned,

6

among other things, that on or about August 21, 2021, Inmate-1 placed a Securus call to the CC-1 1077 Phone. During that call, CC-1 confirmed to Inmate-1 that CC-1 had given "him" an envelope. Later in the call, using coded language, Inmate-1 asked CC-1 how much "bread" was needed and CC-1 responded "2." Based on my training and experience and my involvement in this investigation, I believe CC-1 and Inmate-1 were using coded language confirming that CC-1 had paid $2,000 in exchange for the delivery of an envelope containing contraband.

24.     Based on my review of surveillance footage from AMKC from on or about August 23, 2021, I know that on that date, surveillance footage captured SEAN LINDSAY-JORDAN, the defendant, carrying a yellow envelope into Inmate-1's housing area at AMKC and handing the envelope to Inmate-1.

### LINDSAY-JORDAN's Interview

25.     On or about June 7, 2022, law enforcement officers with the FBI and DOI conducted an interview of SEAN LINDSAY-JORDAN, the defendant. I was one of the participants in that interview. At the beginning of the interview, we advised LINDSAY-JORDAN that his speaking with law enforcement was voluntary, that he was free to leave at any time, and that no work-related disciplinary action would be taken against LINDSAY-JORDAN solely because he chose not to speak with law enforcement. After those warnings, LINDSAY-JORDAN agreed to be interviewed and admitted, in substance and in part, that:

   a.    In or about the summer of 2021, LINDSAY-JORDAN agreed to smuggle contraband into AMKC in exchange for cash bribes, and in fact smuggled contraband into the facility in exchange for bribes on as many as four separate occasions.

   b.    Specifically, in the summer of 2021, Inmate-1—whose identity LINDSAY-JORDAN confirmed after being shown photographs of Inmate-1—offered to bribe LINDSAY-JORDAN in exchange for smuggling cellphones, marijuana, sheets of paper saturated with K2,[3] and cigarettes into AMKC. LINDSAY-JORDAN agreed to that offer. One of the photographs of Inmate-1 shown to LINDSAY-JORDAN depicted Inmate-1 in a jail cell holding what appeared to be marijuana and cigarettes, and LINDSAY-JORDAN stated that he believed those were among the items he brought into AMKC for Inmate-1.

   c.    Inmate-1 instructed LINDSAY-JORDAN to communicate with an intermediary via WhatsApp to arrange payment and the delivery of contraband to LINDSAY-JORDAN, and LINDSAY-JORDAN did so. LINDSAY-JORDAN identified the intermediary as CC-1 from a photograph of CC-1 taken from CC-1's DOC personnel file.

---

[3] Based on my training and experience, I know that "K2" is a colloquial reference to smokable synthetic cannabinoids, a category of substances that typically contain detectable amounts of Schedule I controlled substances or controlled substance analogues, such that their distribution violates 21 U.S.C. § 841. Law enforcement has not yet conducted laboratory tests of sheets of paper believed to have been delivered to Inmate-1 by LINDSAY-JORDAN.

        d.        Following Inmate-1's instructions, LINDSAY-JORDAN initially used WhatsApp to communicate with CC-1. LINDSAY-JORDAN then arranged to meet with CC-1 at an area in the Bronx that he identified by the cross streets.

        e.        CC-1 told LINDSAY-JORDAN, among other things, that CC-1 was a former Correction Officer on Rikers Island, that CC-1 was in a relationship with Inmate-1, and that CC-1 would smuggle contraband into the jail while working as a Correction Officer.

        f.        LINDSAY-JORDAN met with CC-1 to pick up contraband, at most, on four occasions. Each time LINDSAY-JORDAN met with CC-1, CC-1 paid JORDAN $2,000 in cash in exchange for his contraband smuggling.[4] At each meeting, CC-1 also provided contraband. The contraband was similar each time: marijuana, sheets of paper saturated with what LINDSAY-JORDAN understood was K2, and cigarettes. On one occasion, LINDSAY-JORDAN also brought two cellphones to Inmate-1 that had been provided by CC-1.

        g.        After receiving the bribes and contraband at each of these meetings with CC-1, LINDSAY-JORDAN brought the contraband into AMKC and gave it to Inmate-1. To bring the contraband into AMKC, LINDSAY-JORDAN would place the contraband under his vest and carry it through the initial security gate. He would then bring the contraband to a janitor closet in the housing area where Inmate-1 was housed, and would place the contraband in a blue bucket in the janitor closet.

        h.        Separate from the smuggling for Inmate-1 and CC-1 described above, LINDSAY-JORDAN also smuggled sheets of paper saturated with what he understood to be K2 to another inmate, in exchange for bribes from another intermediary, on approximately four other occasions.

        i.        Despite being asked on at least one occasion to smuggle a razor into AMKC, LINDSAY-JORDAN refused, and LINDSAY-JORDAN denied having ever brought weapons into the facility. After 2021, LINDSAY-JORDAN stopped bringing contraband into AMKC.

---

[4] As discussed above, there is evidence that some of the payments from CC-1 to LINDSAY-JORDAN were in fact greater than $2,000.


WHEREFORE, deponent respectfully requests that a warrant issue for the arrest of SEAN LINDSAY-JORDAN, the defendant, and that he be imprisoned or bailed, as the case may be.

<u>Justin Stone (by VF with permission)</u>
Justin Stone
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this
Complaint by reliable electronic means, pursuant to
Federal Rule of Criminal Procedure 4.1, this
21st day of February 2023.

_____
THE HONORABLE VALERIE FIGUEREDO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK